**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| MUSC FOUNDATION FOR RESEARCH DEVELOPMENT and CHARLESTON MEDICAL THERAPEUTICS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ASTRAZENECA PHARMACEUTICALS LP, <br><br> Defendant. | Civil Action Nos.:  2:13-cv-02078-RMG <br> 2:13-cv-03438-RMG |

**MUSC FOUNDATION FOR RESEARCH DEVELOPMENT
AND CHARLESTON MEDICAL THERAPEUTICS, INC.'S
MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Although the parties have made their best efforts to confer in good faith and resolve many discovery disputes, several important issues remain to be decided by the Court.  Pursuant to Federal Rule of Civil Procedure 37(a)(2)(B), and Local Civil Rule 37.01 DSC, Plaintiffs MUSC Foundation for Research Development and Charleston Medical Therapeutics, Inc. ("Plaintiffs") move to compel AstraZeneca Pharmaceuticals LP ("AstraZeneca" or the "Company") to produce:  (1) documents related to investigations of AstraZeneca's off-label promotion of pharmaceuticals from 2007-2011; (2) certain documents concerning AstraZeneca's 2008 agreement with Abbott Laboratories ("Abbott") to co-promote Crestor®; (3) contracts and agreements related to payments rendered to Brigham and Women's Hospital; (4) documents concerning the prosecution of patents on which Dr. Paul Ridker is the named inventor; and (5) documents concerning AstraZeneca's determinations as to which patents cover Crestor®.

Each of these categories is relevant, or likely to lead to relevant information, and for the reasons below, Plaintiffs respectfully ask the Court to compel their production.[1]

## I. BACKGROUND

In light of the Court's recent order on claim construction, this action has in effect been narrowed to one patent-in-suit: U.S. Patent No. 6,511,800 (the "'800 Patent"). The '800 Patent, entitled "Methods of Treating Nitric Oxide and Cytokine Mediated Disorders," was invented by Dr. Inderjit Singh, Distinguished University Professor of Pediatrics and Scientific Director of the Children's Research Institute at the Medical University of South Carolina. Dr. Singh made the important discovery that statins reduce inflammation and can effectively treat various neuro-inflammatory disorders, such as stroke, as well as other inflammatory disorders that are mediated through the vascular system, such as heart disease. In the process, Dr. Singh determined that the anti-inflammatory effects of statins are not mediated through cholesterol pathways despite the fact that statins have long been recognized as inhibiting the rate limiting enzyme in the cholesterol biosynthesis pathway, HMG-CoA reductase. Dr. Singh's discovery was contrary to the conventional wisdom regarding statins' mechanism of action, and Dr. Singh was the first to recognize that statins could be used to reduce inflammation independent of their effect on cholesterol.

There is no dispute that AstraZeneca has been aware of the '800 Patent since at least 2003, when Dr. Steven Brostoff, on behalf of MUSC, offered AstraZeneca a license to the '800

---

[1] In compliance with Local Civil Rule 7.02 DSC, counsel for Plaintiffs certifies it consulted with counsel for AstraZeneca in an attempt to resolve this matter prior to filing this motion.

Patent for the use of Crestor® to treat inflammatory disorders.  On December 16, 2003,

Dr. Brostoff wrote to Christer Carling of AstraZeneca:

> As a follow up to our conversations today, I am representing the Medical University of South Carolina regarding the licensing of their recently issued patent concerning the use of statins to treat inflammatory diseases.  The patent can be downloaded from the following website:    http://www.musc.edu/frd/US06511800B1.pdf.
>
> There is an opportunity to expand the labeling for Crestor to a variety of inflammatory diseases such as Rheumatoid Arthritis and Alzheimer's disease.  We would like to find exclusive licensees for these diseases.  There is also an opportunity to promote the use of statins for prevention of heart disease and stroke for patients at risk for these conditions.  Recent studies have indicated that this property of statins has been shown to be independent of cholesterol level presumably due to the anti-inflammatory nature of the statins as shown by the reduction in C reactive protein.  We are considering offering non-exclusive licenses for these indications.

E-mail from Steven Brostoff, Ph.D. to Christer Carling, AstraZeneca (Dec. 16, 2003, 10:15 AM),

No. 2:13-CV-3438-SB ('219 Case), ECF No. 1-11.

Shortly thereafter, AstraZeneca began the JUPITER Trial, a study to evaluate whether

patients who had an indication of vascular inflammation, but not high cholesterol, could benefit

from taking Crestor®.  Again, Dr. Brostoff reminded AstraZeneca of the '800 Patent and warned

that promotion of the results of the JUPITER Trial would infringe the '800 Patent:

> I read with interest that AstraZeneca is engaged in a very large study due to end in 2007 to study the beneficial effects of Crestor in patients with inflammation of blood vessels.  If this report is correct and if the results are positive (as I expect them to be) then AstraZeneca will need a license from MUSC to promote the results of this study.

E-mail from Steven Brostoff, Ph.D. to Christer Carling (Apr. 21, 2004, 2:45 PM), '219 Case,

ECF No. 1-8.  Notably, in April of 2004, several years before the conclusion of the JUPITER

Trial, Dr. Brostoff predicted its success.  Dr. Singh's own research in the mid-1990s, as

described in the '800 Patent, had already demonstrated that statins are effective in treating

inflammatory diseases in a cholesterol-independent way.    Dr. Brostoff expected that the JUPITER Trial would further confirm Dr. Singh's results.

Despite this knowledge, AstraZeneca refused to take a license to the '800 Patent: "[W]e do not feel we need to seek a licence under your patent for our ongoing and planned activities in the statin area."  E-mail from Christer Carling to Steven Brostoff, Ph.D. (Mar. 5, 2004, 7:35 AM),'219 Case, ECF No. 1-8.  Plaintiffs brought suit for patent infringement in June of 2013. *See* ECF No. 1.

Plaintiffs contend that AstraZeneca induces infringement of the '800 Patent by promoting the use of Crestor® to treat individuals with vascular inflammation — the JUPITER indication. At trial, the parties will contest when infringement began.  AstraZeneca will contend that it did not begin promoting the use of Crestor® for the JUPITER indication until AstraZeneca received FDA approval in 2010 and issued a new label with Indication 1.6, which is the indication of use corresponding to the JUPITER Trial.  Plaintiffs, however, will show that AstraZeneca's infringement began at least as early as November 2008, when AstraZeneca released the results of the JUPITER Trial at the annual conference of the American Heart Association ("AHA").

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

*See* AZM00496185-193 at 6 (Nov. 6, 2008) (████████████████████████████

████████████████████████████████████████████████

████████████████████) ("JUPITER Presentation") (attached as Ex. A).  Meanwhile, from

4

2006 to 2010, AstraZeneca was being investigated by the U.S. Department of Justice ("DOJ") for promoting "off-label" pharmaceutical use.

AstraZeneca has asserted that it is not liable for induced patent infringement. First, AstraZeneca maintains that it had a reasonable belief that the '800 Patent was either invalid or not infringed. *See* Answer to Pls.' First Am. Compl. for Patent Infringement 11 (Jan. 6, 2014), ECF No. 59. Second, AstraZeneca contends that Dr. Ridker, the Principal Investigator of the JUPITER Trial, was the first to invent the technology giving rise to the '800 Patent, and therefore the '800 Patent is invalid. *See* Def.'s [Proposed] Supplemental Invalidity Contentions 2-3 (Aug. 25, 2014), ECF No. 123-1 ("Def.'s Invalidity Contentions").

## II.    ARGUMENT

### A.    INVESTIGATIONS REGARDING OFF-LABEL PROMOTION OF PHARMACEUTICALS

AstraZeneca refuses to produce documents related to the DOJ's investigation and other investigations of the Company's off-label promotion of pharmaceuticals in violation of FDA regulations. The DOJ investigation was taking place at or around the time that AstraZeneca was releasing and promoting the results of the JUPITER Trial. On April 27, 2010, the DOJ issued a press release stating it had found, among other infractions, that "AstraZeneca promoted the unapproved uses by improperly and unduly influencing the content of, and speakers, in company-sponsored continuing medical education programs." Press Release, DOJ, Pharmaceutical Giant AstraZeneca to Pay $520 Million for Off-label Drug Marketing (Apr. 27, 2010) ("April 27, 2010 Press Release") (attached as Ex. B). The DOJ's investigation culminated in a $520 million payment by AstraZeneca and a "Corporate Integrity Agreement" — an attempt by the DOJ to reverse the off-label promotion occurring at AstraZeneca. The Corporate Integrity Agreement required, among other things, that a committee of AstraZeneca's Board of Directors

annually review the Company's compliance with FDA regulations with regard to the promotion of pharmaceuticals. *Id.*

Plaintiffs have asked AstraZeneca to produce documents related to the DOJ investigation and the resulting Corporate Integrity Agreement, as well as any documents related to an investigation concerning the promotion of Crestor® or the JUPITER indication prior to FDA approval of Indication 1.6. AstraZeneca, however, refuses to produce any of the investigation documents.[2] Seeking to avoid its discovery obligation, AstraZeneca has argued that: (1) Plaintiffs' request is "irrelevant" and "designed to harass and drive up the cost of discovery," Letter from Emily White to John Garvish at 4 (July 25, 2014) (attached as Ex. F); (2) the investigation had "nothing to do with statins or Crestor," Transcript of Motion to Compel Hearing 21:21-22:2 (July 16, 2014) ("Hr'g Tr."); and (3) as counsel argued during the parties' last conference, the investigation did not amount to anything. None of these objections has merit.

*First*, AstraZeneca's practice regarding off-label promotion of pharmaceuticals from 2008 to 2011 is directly relevant to establishing AstraZeneca's liability for induced infringement as well as determining the timeframe for damages in this case. AstraZeneca claims that it abided by FDA regulations and did not begin promoting the JUPITER indication until obtaining FDA

---

[2] In particular, AstraZeneca has refused to produce: "documents, information and communications relating to any compliance investigation concerning the JUPITER Trial (RFP 186); documents concerning any United States Department of Justice investigation of AstraZeneca related to the promotion of off-label use of pharmaceuticals (RFP 202); documents concerning AstraZeneca's Corporate Integrity Agreement resulting from the Department of Justice Investigation (in addition to the agreement itself) (RFP 203); and documents concerning internal or external reports or investigations of AstraZeneca's off-label promotion of Crestor (RFP 204)." Letter from John Garvish to Jason Fowler (Oct. 28, 2014) ("Garvish Letter") (attached as Ex. C); *see also* Letter from Emily Keatley to John Garvish (Oct. 31, 2014) ("Keatley Letter") (attached as Ex. D); Pls.' Second Set of Reqs. for Produc. to Def. (Nos. 96-205) (attached as Ex. E).

approval in 2010. But Plaintiffs have uncovered evidence to suggest that AstraZeneca began promoting the indication "off label" — *before* FDA approval — as soon as AstraZeneca released the results of the JUPITER Trial in November of 2008. AstraZeneca strategically coordinated the release of the JUPITER Trial for the afternoon of November 9, 2008 so that the results of the JUPITER Trial would make a big splash at the annual AHA meeting in New Orleans, Louisiana.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████     *See* JUPITER

Presentation.  ████████████████████████████████████████████

████  *id.* at 3 ███████████████████████████████████

████████████████████████████

Indeed, Plaintiffs allege that AstraZeneca has induced infringement of the '800 Patent since 2008 by, among other things, promoting the results of the JUPITER Trial at medical-related conferences and sponsoring speakers to tout the benefits of Crestor® for use in accordance with the JUPITER Trial. The DOJ found that AstraZeneca was engaging in the very same conduct with respect to Seroquel: "AstraZeneca promoted the unapproved uses by improperly and unduly influencing the content of, and speakers, in company-sponsored continuing medical education programs. The company also engaged doctors to give promotional speaking programs on unapproved uses for Seroquel and to conduct studies on unapproved uses of Seroquel." April 27, 2010 Press Release. Investigations of AstraZeneca's off-label promotion

of pharmaceuticals during the relevant timeframe, then, are directly relevant to Plaintiffs' induced infringement and damages theories, as well as to AstraZeneca's defenses.[3]

*Second*, although AstraZeneca has claimed the DOJ investigation had "nothing to do with statins or Crestor" because it was related to Seroquel, Hr'g Tr. 21:21-22:2, AstraZeneca's own evidence suggests otherwise. ▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅ AZM00310868-903 at 16 (Apr. 30, 2010) (emphasis added) (attached as Ex. G); *see also* AZM00434309-70 at 38 (Apr. 9, 2010) (▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅) (attached as Ex. H). ▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅

▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅ Any investigation related to the promotion of JUPITER in the 2008-2011 timeframe is directly relevant to AstraZeneca's liability for induced infringement.

*Third*, AstraZeneca's claim that the investigations "did not amount to anything" only supports Plaintiffs' motion to compel. Plaintiffs suspect that AstraZeneca was engaging in off-label promotion. AstraZeneca rejects that assertion. The result of an investigation — *one way or*

---

[3]     At the July hearing on the motion to compel, this Court noted that, "[t]o the extent [Plaintiffs] did, in fact, learn something as material as the defendant was promoting an off brand use improperly, in violation of FDA standards, . . . that might be relevant." Hr'g Tr. 9:24-10:2.

*the other* — will support either Plaintiffs' or Defendant's version of events. At the very least, Plaintiffs are entitled to discovery to test their assertions. Moreover, that the investigation "did not amount to much" only suggests that AstraZeneca's burden in producing these documents would be light and prejudice minimal.

### B.    ASTRAZENECA'S 2008 AGREEMENT WITH ABBOTT TO CO-PROMOTE CRESTOR®.

In August of 2008, three months before the release of the JUPITER Trial results, AstraZeneca entered into an agreement with Abbott to co-promote Crestor® in the United States. *See* Press Release, AstraZeneca, AstraZeneca and Abbott Expand Relationship to Include Co-Promotion of CRESTOR® (Aug. 14, 2008) (attached as Ex. I). According to the terms of the agreement, Abbott obtained the non-exclusive right to promote Crestor® alongside AstraZeneca. Plaintiffs have asked AstraZeneca to produce documents concerning this collaboration. AstraZeneca, however, has agreed only to produce the agreement itself, payments rendered to Abbott, and Crestor® approved marketing materials. *See* Keatley Letter at 2 ("AstraZeneca reiterates its offer to produce the agreements between AstraZeneca and Abbott regarding co-promotion of Crestor® and documents sufficient to show payments made by AstraZeneca to Abbott pursuant to those agreements.").

AstraZeneca refuses to produce the requested "presentations, proposals, negotiation communications, . . . instructions to sales personnel, and internal memoranda" concerning AstraZeneca's agreement with Abbott. Garvish Letter at 1. These are discoverable documents that are directly relevant to induced infringement. AstraZeneca and Abbott were contemplating their joint promotion strategy just as AstraZeneca was concluding the JUPITER Trial and planning to release the results of that trial in late 2008. It is highly likely that they would have communicated regarding the JUPITER Trial and the effects of the trial on Crestor® sales. In fact,

9

the release of the JUPITER results may have prompted AstraZeneca to enter into the agreement with Abbott in the first place, and AstraZeneca and Abbott may have made plans to tout the results of the JUPITER Trial as part of their joint promotion strategy.  These facts would be reflected in the specific documents requested by Plaintiffs: presentations, proposals, negotiation communications, instructions to sales personnel, and internal memoranda concerning Abbott. Plaintiffs, therefore, respectfully ask the Court to compel their production.

> **C.**    **CONTRACTS AND AGREEMENTS CORRESPONDING TO PAYMENTS RENDERED TO BRIGHAM AND WOMEN'S HOSPITAL.**

In March, Plaintiffs moved to compel AstraZeneca to produce all documents reflecting payments rendered by AstraZeneca to Brigham and Women's Hospital.  At the time, AstraZeneca argued that only payments concerning the JUPITER Trial or the '152 Patent were relevant to this suit.  This Court, however, disagreed and ordered AstraZeneca to produce documents reflecting payments rendered to Brigham and Women's Hospital.  *See* Order at 1 (July 16, 2014), ECF No. 113.  In response, AstraZeneca produced receipts showing various payments to Brigham and Women's Hospital.  These receipts, however, have proven to be difficult to decipher because AstraZeneca neglected to produce the corresponding contracts and agreements.  Without the corresponding agreements, Plaintiffs and their expert cannot understand the reason for any particular receipt.  Plaintiffs have asked AstraZeneca to produce the corresponding contracts and agreements giving rise to AstraZeneca's payment obligations to Brigham and Women's Hospital, but AstraZeneca has refused to produce these documents.  *See* Keatley Letter.  Plaintiffs therefore respectfully move to compel their production.

> **D.**    **DOCUMENTS RELATED TO THE PROSECUTION OF THE '152, '147, AND '614 PATENTS.**

AstraZeneca asserts that the '800 Patent is invalid because Dr. Ridker allegedly invented the technology giving rise to the '800 Patent before Dr. Singh.  *See* 35 U.S.C. § 102(g)(2)

10

(setting forth that a patent is valid only if its named inventor was the first to invent the claimed invention). Plaintiffs have asked AstraZeneca to produce documents related to the prosecution of Dr. Ridker's patents, as these documents are directly relevant to the timing and nature of Dr. Ridker's alleged prior invention. *See* Garvish Letter. AstraZeneca refuses to produce responsive documents, claiming it does not own these patents and patents other than the '152 Patent are not relevant. *See* Keatley Letter at 2. Neither argument is persuasive.

*First*, even though AstraZeneca does not own these patents, AstraZeneca was involved in their prosecution. AstraZeneca, therefore, should have these documents within its possession. At the very least, AstraZeneca is required to conduct a diligent search, and if it does not have responsive documents, to so state.

*Second*, documents related to Dr. Ridker's patent applications are relevant to rebut AstraZeneca's prior invention theory. Dr. Singh discovered, in highly technical clinical experiments, that statins reduce inflammation in a cholesterol-independent fashion. He conducted experiments — first *in vitro* with animal cells, then *in vivo* with animals, then *in vitro* with human cells, and finally *in vivo* with humans — that demonstrated that statins are effective in reducing inflammation. More specifically, Dr. Singh discovered that statins are effective at inhibiting the production of undesired nitric oxide and pro-inflammatory cytokines. This discovery was both important and novel. Before Dr. Singh's work, statins had been used exclusively to reduce cholesterol. Now statins could also be used to reduce inflammation irrespective of cholesterol levels. At trial, Plaintiffs will show that at the time of Dr. Singh's experiments, Dr. Ridker had not discovered that statins reduce inflammation independently of cholesterol. In fact, Dr. Ridker is currently engaged in a trial called the Cardiovascular Inflammation Reduction Trial (CIRT) in which he is *still* exploring whether reduction of

11

inflammation has any effect on cardiovascular disease.  *See* Everett et al., *Rational and design of the Cardiovascular Inflammation Reduction Trial:  A Test of the Inflammatory hypothesis*, 166 Am. Heart J. 199, 200 (2013).

Indeed, while Dr. Singh was discovering that *statins* reduce inflammation during 1996 and 1997, Dr. Ridker was working with *aspirin* — not statins. In AstraZeneca's Invalidity Contentions, AstraZeneca attempts to support its prior invention theory by pointing to research that led to Dr. Ridker's *New England Journal of Medicine* article in April of 1997.  *See* Def.'s Invalidity Contentions 3.  That research, however, related to *aspirin.*  The article is entitled *Inflammation, **Aspirin**, and the Risk of Cardiovascular Disease in Apparently Healthy Men.* Ridker et al., *Inflammation, Aspirin, and the Risk of Cardiovascular Disease in Apparently Healthy Men*, 336 New Eng. J. Med. 973 (Apr. 3, 1997) (emphasis added) (attached as Ex. J). Dr. Ridker does not use the word "statin" anywhere in the article.

Documents related to the prosecution of Dr. Ridker's patents will illuminate the timing of Dr. Ridker's own research and alleged invention.  When Dr. Ridker first applied for a patent related to high sensitivity C-Reactive Protein on April 2, 1997, his draft claims did not include the word "statin."  *See* U.S. Patent Application No. 09/054,212, Publication No. 6040147 at 8-9 (Paul Ridker, applicant) (attached as Ex. K).  Indeed, while the '152 patent specification lists more than one hundred anti-inflammatory drugs, "statin" is not one of them.  U.S. Patent No. 7,030,152 at col. 11 (statins listed as lipid-lowering agents, not anti-inflammatory agents).  It was not until years later that Dr. Ridker added statins to the claims, and by the time the '152 Patent was granted in 2006, the claims had changed to include a method of treatment using statins to reduce cardiovascular disease and stroke in individuals without elevated cholesterol.  U.S. Patent No. 7,030,152 at col. 32 (granted Apr. 18, 2006).  The documents requested by Plaintiffs may

help to explain this evolution. As Dr. Singh's invention concerns methods of treatment for the use of *statins as anti-inflammatory agents*, Dr. Ridker could not possibly be the prior inventor if he did no research related to statins prior to Dr. Singh's invention. The documents concerning his patent applications for all three of his patents, then, are highly relevant to a critical question in this case: when, if ever, did Dr. Ridker invent the use of statins to reduce inflammation? Plaintiffs, therefore, respectfully ask the Court to compel their production.

### E.    DOCUMENTS CONCERNING ASTRAZENECA'S DECISION(S) TO LIST THE '460, '618, '314, AND '614 PATENTS IN THE ORANGE BOOK.

AstraZeneca refuses to produce any documents relating to four of the patents it lists in the FDA's Orange Book[4] as covering Crestor®. In this case, AstraZeneca has asserted the affirmative defenses that Plaintiffs' claims are barred because Crestor® does not practice the claims of Plaintiffs' patent; and that AstraZeneca does not have the requisite intent to induce infringement of the asserted patents because it "is reasonably believed" that AstraZeneca is not infringing. *See* Tenth Defense, Def.'s Answer to Pls.' First Am. Compl. at 11 (Jan. 6, 2014), ECF No. 59. Yet, AstraZeneca readily admits in the Orange Book that Crestor® practices the claims of the '460, '618, '314, and '614 Patents. In order to make this determination, AstraZeneca may have some process to evaluate when Crestor® does or does not practice the claims of a patent. Discovery related to AstraZeneca's decision to list the '460, '618, '314, and '614 patents in the Orange Book as covering Crestor® would provide insight as to how AstraZeneca makes its determinations. Plaintiffs can then use this information to evaluate the accuracy of AstraZeneca's assertions that it does not infringe the patents-in-suit and that its

---

[4]    Orange Book: Approved Drug Products with Therapeutic Equivalence Evaluations (Mar. 2014), *available at* http://www.accessdata.fda.gov/scripts/cder/ob/docs/temptn.cfm (last viewed Mar. 17, 2014) (the "Orange Book").

belief that it does not infringe was "reasonable." Given the importance of this information to assessing AstraZeneca's infringement defenses, AstraZeneca should be compelled to produce documents relating to its decision-making process.

### III.    CONCLUSION

In summary, Plaintiffs respectfully request an order compelling AstraZeneca to produce:

1. Documents, information and communications relating to any compliance investigation concerning the JUPITER Trial (RFP 186); documents concerning any United States Department of Justice investigation of AstraZeneca related to the promotion of off-label use of pharmaceuticals (RFP 202); documents concerning AstraZeneca's Corporate Integrity Agreement resulting from the Department of Justice Investigation (in addition to the agreement itself) (RFP 203); and documents concerning internal or external reports or investigations of AstraZeneca's off-label promotion of Crestor (RFP 204);

2. Presentations, proposals, negotiation communications, instructions to sales personnel, and internal memoranda concerning AstraZeneca's 2008 agreement with Abbott (RFPs 123 and 188);

3. Contracts and agreements related to payments made to Brigham and Women's Hospital (RFPs 85 and 196);

4. Documents related to the prosecution of the '152, '147, and '614 patents (RFP 127); and

5. Documents concerning AstraZeneca's decision(s) to list the '460, '618, '314, and '614 patents in the Orange Book (RFP 151).

Dated:  December 11, 2014                          Respectfully submitted,

By:   s/ *Joshua C. Littlejohn*
Joseph F. Rice, Fed. ID No. 3445
jrice@motleyrice.com
Joshua C. Littlejohn, Fed. ID No. 10426
jlittlejohn@motleyrice.com
Max N. Gruetzmacher, Fed. ID No. 11549
mgruetzmacher@motleyrice.com
**MOTLEY RICE LLC**
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
Telephone: (843) 216-9000
Facsimile:  (843) 216-9450

William H. Narwold, Fed. ID No. 11692
bnarwold@motleyrice.com
**MOTLEY RICE LLC**
One Corporate Center
20 Church St., 17th Floor
Hartford, CT  06103
Telephone: (860) 882-1681
Facsimile:  (860) 882-1682

Of Counsel:
Samuel F. Baxter
sbaxter@mckoolsmith.com
Ryan Hargrave
rhargrave@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, TX  75201
Telephone: (214) 978-4000
Facsimile:  (214) 978-4044

John F. Garvish, II
jgarvish@mckoolsmith.com
Kevin Lee Burgess
kburgess@mckoolsmith.com
John B. Campbell
jcampbell@mckoolsmith.com
Kristina S. Baehr
kbaehr@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 W. 6th Street, Suite 1700
Austin, TX  78701
Telephone: (512) 692-8700
Facsimile:  (512) 692-8744

*Attorneys for Plaintiffs*

15